**Gerald CYGNAR, et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**No. 85C5902.**

United States District Court,
N.D. Illinois, E.D.

Jan. 29, 1987.

John Gubbins, Chicago, Ill., for plaintiffs.

Jonathan Siner, Arthur Christie, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

This Court's December 30, 1986 memorandum opinion and order (the "Opinion" 652 F.Supp. 287) included a partial deferral of ruling on defendants' post-trial motions, requesting (*id.* at 293–94, 301) further submissions from counsel for the parties.[1] Those submissions are now in hand, and the unfinished work can be completed.

---

1. This opinion will assume familiarity with the Opinion. It will (1) use the same defined terms and (2) avoid repetition of the Opinion's substantive discussion except where necessary for clarity of understanding.

At the outset it is worth stating again the basic premises from which this Court is required to—and therefore does—proceed:

1. Mathis did in fact make at least *some* transfers out of OMI because of race—because the transferred police officers were white. And those race-motivated transfers "[were] perceived by Mathis as a means to correct what he considered a previously-existing racial imbalance within OMI" (the jury's specific finding). Both those findings are compelled by the jury's affirmative responses to special interrogatories, coupled with the fact that the evidence as to some plaintiffs (when viewed in the light most favorable to them) allowed the jury to make those responses reasonably.

2. But those findings cannot rationally apply to *all* Mathis' transfers out of OMI: Out of 30 police officers he transferred into the unit as replacements, 13 (more than 40%) were white males. Many of the transfers therefore can be rationally explained *only* in terms other than race-motivated: Mathis' desire to bring in people he knew and trusted or who were recommended to him by people he knew and trusted.[2]

As the Opinion indicated and simple logic commands, it is essential to treat with each plaintiff—as a separate claimant—to determine whether the jury could reasonably have placed him in the first category (therefore upholding an award of damages) rather than the second (therefore requiring judgment notwithstanding the verdict).

■ One other point should be made early on. Plaintiffs' counsel points out, accurately enough, the undeniable proposition that it is not necessary to show an employee's replacement was of a different race in order to prove race-discriminatory intent on the employer's part. See, e.g., *DeLesstine v. Fort Wayne State Hospital and Training Center*, 682 F.2d 130, 132–33 (7th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed.2d 511 (1982). But counsel moves from that premise to the impermissible conclusion that in a case such as this, the race of plaintiffs' replacements is somehow irrelevant. That is really a non sequitur. Existence of racial motivation, the question at issue in *DeLesstine* and like cases, is a *given* here because of the jury's special interrogatory answers. But where non-racial motivation was *also* at work (as here), and where the question then becomes one of identifying whether race reasonably accounts for the transfer out of a *particular* plaintiff, the factual matrix of the transfers in—of the respective plaintiffs' replacements—must perforce be highly relevant to the individualized analysis.

Against that backdrop, this opinion turns to the remaining eight plaintiffs in light of the parties' further submissions. Because those plaintiffs naturally fall into two groups (despite the need to consider them individually), that grouping will be followed in the analysis.

### *Capesius, Gartner and Wojnar*

■ Each of Capesius and Wojnar left OMI in mid-June 1984, not as the result of a transfer by Mathis but at the plaintiff's own request. That of itself must create a problem for recovery, because it requires a kind of doubly-hypothetical question: *If* Mathis had transferred the plaintiff, would that transfer have been racially motivated?[3] After all, if the only employer moti-

---

**2.** As the Opinion reflects, the jury also gave a "yes" answer to another possible kind of motivation—political—as to *every* plaintiff, despite the total absence of evidentiary support for any such finding as to at least some plaintiffs (and despite the tenuous basis for any such finding as to each of the others). Opinion, 652 F.Supp. at 294–95 explains in detail why those "yes" answers were therefore so tainted as to require their total rejection. Moreover, Opinion, *id.* at 297 suggests that even if any political motivations had been present, given the fact such motivations are constitutionally permitted where "confidential" employees are involved, they could well still be nonactionable in light of the sensitive and confidential investigatory responsibilities of the OMI people.

**3.** This Court has elsewhere referred to the perhaps apocryphal story of the English lawyer arguing before the House of Lords and confronted with a particularly abstruse and contingent hypothetical question by one of the Law Lords. As the story has it, the lawyer responded:

Milord, your question is much like asking me, "If I had a brother, would he like potatoes?"

vation for a contemplated transfer is racial, a plaintiff who asks to be transferred rather than waiting for the axe to fall can fairly claim the inference *his* transfer was race-motivated—that it simply accelerated an inevitable and unquestionably race-biased action by the employer. But where some transfers initiated by an employer were and others were not race-based, the plaintiff who jumps the gun has real problems in contending for the fictional proposition that it is reasonable for a jury to have found his voluntary transfer was (because he claims his expected transfer would have been) race-motivated.

Gartner does not face that same threshold problem. According to his testimony (which the jury was entitled to credit), Mathis told him he was going to go out of the unit, adding if Gartner wanted any help (as to reassignment) he should just ask. Gartner responded, "No, thanks" and then—on his own—asked the Police Department directly for a transfer. If then the evidence reasonably supported the inference of race motivation as to Gartner on Mathis' part, Gartner would be home free.

What was the evidence as to the motivation that impacted on each of the three plaintiffs? There was none at all as to Gartner. As for Capesius and .Wojnar, each talked in mid-June with plaintiffs Cappitelli or DiMaggio or both (they were supervisors whose transfers out of the unit had just been ordered by Mathis [4]). Capesius also spoke with outgoing Director of Operations Paul Lewis (who had asked for a transfer out of the unit in June). As to each of Capesius and Wojnar, the supervisors warned that if they did not transfer out quickly, they could be transferred without notice to any Police Department assignment. Each of the two immediately asked for a transfer to a Police Department assignment of his choice and was given that assignment. Gartner too received the Police Department assignment he asked for in his transfer request.

Nothing in the evidence ascribes the ideas of any of the supervisors to Mathis, the one responsible for City's personnel change decisions at OMI. None of the supervisors played any role at all in those decisions (even Lewis had never discussed such matters with Mathis or with incoming Director of Operations Lindsay), and their views and expressions cannot rationally be placed at City's door. All the same, it does not do violence to the evidence to say it still rationally supports the conclusion Capesius and Wojnar (as well as Gartner) would in fact have been transferred out of OMI. After all, at the end of less than five months after Mathis took over, 30 of the 32 police officers in the unit when Mathis arrived were no longer there.

That however—transfer alone—is not the issue. What controls here is the already-explained fact that though a number of transfers made at *Mathis'* instance were race-motivated, a substantial number were not. Each of the three plaintiffs under consideration here, by his conduct, rendered it impossible to say what would have caused his involuntary transfer had one been ordered. And as to Gartner, there has been no showing to support a race-motivated decision by Mathis—in fact, given the more responsible nature of Gartner's OMI assignment (one more at the administrative level), the inference cuts the other way: in favor of Mathis' desire to staff the unit with people he felt he could rely on.

It is nothing less than gross speculation to attribute any of the three transfers to plaintiffs' race. Such speculation cannot be the basis for the "reasonable inference" necessary to uphold a jury verdict. Purely and simply, each of Capesius, Gartner and Wojnar has failed to prove an essential element of his cause of action. Accordingly judgment notwithstanding the verdict is entered against each of them and in favor of City on the race-discrimination claim.

### *Cygnar, Flanagan, O'Driscoll, Rubino and Shanahan*

Each of the five remaining plaintiffs was part of a group of eight white officers transferred involuntarily July 25, 1984.

---

**4.** Opinion, 652 F.Supp. at 292 upheld as reasonably supported by the evidence, the jury's findings those transfers (part of the initial group) were race-motivated.

Thus none of them calls for the two-level speculation referred to in the preceding section. It is necessary to deal only with the evidence (including reasonable inferences) as to City's motivations for the actual (rather than hypothetical) transfers of those officers.

■■■ Flanagan testified he was replaced by a black male officer, Tommie King. That was testimony the jury was entitled to credit, and it would therefore support the verdict in Flanagan's favor.[5] Judgment n.o.v. as to Flanagan is denied, but (as with Cappitelli and DiMaggio) City's motion for new trial is granted on the race-discrimination claim unless, at Flanagan's option, a remittitur to $15,000 in damages on that claim is accepted.

■■ But what that means is that the remaining four plaintiffs were transferred out, as part of a group of seven white officers, at the same time that six officers besides King were transferred in: four white males, one black male and one black female (Mathis' memoranda having reflected, and his actions having demonstrated, he wanted to increase the number of female officers in the unit—only one had been there when he took over). That being true, it cannot be said the evidence, even with all reasonable inferences in each plaintiff's favor, can rationally support a finding that any of the Cygnar, O'Driscoll, Rubino or Shanahan transfers was racially motivated. Judgment notwithstanding the verdict must be entered against each of them and in City's favor.

### Rule 54(b) Determination

■■ To recapitulate the results of the Opinion and this opinion, judgments notwithstanding the verdict have been entered against 10 of the 13 plaintiffs (all except Cappitelli, DiMaggio and Flanagan) and in favor of each of City and Mathis on both the race-discrimination and political-discrimination claims. Thus Rule 54(b) determinations, as requested by those plaintiffs and not opposed by defendants, are possible as to each of the plaintiffs in that first group.

As this Court has already pointed out, these are really to be viewed as 13 separate cases. Those "cases" are over as to those ten plaintiffs against both defendants. Nothing in what remains—a new trial on the race-discrimination claims as to the other three plaintiffs against City—will cast further light on the matters affecting the first ten, and there is no reason to defer finality of the decisions on their claims. See *National Metalcrafters v. McNeil*, 784 F.2d 817, 821 (7th Cir.1986). Accordingly this Court expressly directs that final judgment be entered, and expressly determines there is no just reason for delay, as to each of the following judgments affecting plaintiffs Bleke, Capesius, Cygnar, Gartner, Murray, O'Driscoll, Riggio, Rubino, Shanahan and Wojnar:

1. judgment in favor of Mathis and against each of those plaintiffs on both their political-discrimination and their race-discrimination claims; and

2. judgment in favor of City and against each of those plaintiffs on both those claims.

Different considerations apply to plaintiffs Cappitelli, DiMaggio and Flanagan. Though this Court has ruled finally on their claims against Mathis and on their political-discrimination claims against City, it has ordered a new trial (unless a remittitur is accepted) on their respective race-discrimination claims against City. Because it does not matter in liability terms whether an employer is found guilty of one or two acts of prohibited discrimination, a jury verdict in a plaintiff's favor on retrial could render moot part of the issues on which plaintiffs seek to appeal now (that is, the political-discrimination issues).

Accordingly this Court expressly directs that final judgment be entered and expressly determines there is no just cause for delay as to the judgment in favor of Mathis

---

**5.** Again, though it is not *necessary* to show replacement by a person of a different race to prove racial discrimination, the trier of fact can certainly rationally treat such replacement as *evidence* of such discrimination (particularly where, as here, a number of transfers have taken place and there are both racial *and* nonracial motivations for ordering transfers).

and against each of Cappitelli, DiMaggio and Flanagan on each of their discrimination claims (to that extent, the cases are over as to Mathis, and the *National Metalcrafters* analysis applies). This Court denies any such direction and determination as to those plaintiffs' political-discrimination claims against City.

*Certification Under 28 U.S.C. § 1292(d)*

For the same reasons as stated at the end of the preceding section, certification for immediate appeal is denied as to the rulings in the Opinion and this opinion granting judgment n.o.v. against Cappitelli, DiMaggio and Flanagan on their political-discrimination claims against City, and denying judgment n.o.v. but granting a new trial on those plaintiffs' race-discrimination claims against City. This Court is not prepared to find as to those matters that the Opinion involves a controlling question of law or that an immediate appeal may materially advance the ultimate determination of the litigation—that plaintiffs have established their burden of demonstrating "that exceptional circumstances justify departure from the basic policy of postponing appellate review until after the entry of a final judgment" (*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1977), quoting our Court of Appeals in *Fisons, Ltd. v. United States*, 458 F.2d 1241, 1248 (7th Cir.1972)).